## McConville, Appellant, *v.* Ingham et al.

*Gift—Evidence—Burden of proof—Endorsement of check—Presumption—Weakness of alleged donor.*

1. The burden of proving that a gift was made, is upon the one who alleges it.

2. The endorsement of a check to one in absolute form raises a presumption of a gift.

3. If the relations between a donor and donee are such that because of weakness, dependence or trust justifiably reposed, unfair advantage is rendered probable, the transaction is presumed void, and the burden of proof is upon the donee to show that all was fair, open, voluntary and well understood.

4. Where an unnamed third party undertakes to prove by parol that he was the person intended to be benefited by a gift, the evidence must be clear, explicit and convincing, not only as to the existence of the trust but as to its terms and conditions.

5. As between a donor and donee, however, this rule is not applicable when the question to be determined is whether or not the gift was unfairly obtained.

*Appeals—Equity—Findings of fact—Review—Evidence—Pleading—Answer—Remedy at law—Question not put down for decision in limine—Act of June 7, 1907, P. L. 440.*

6. Findings of fact based on adequate evidence will not be reversed by the appellate courts except for plain mistake.

7. If upon examination of the record it appears that plain mistake exists because facts have been found without proof, or material facts established by the proofs have not been found, it is the duty of the appellate courts to find the real facts and to enter the proper decree.

8. If an answer avers that there is an adequate remedy at law, but this question is not put down for a decision in limine before a hearing of the case upon the merits, as required by the Act of June 7, 1907, P. L. 440, and is not raised by a point at the trial, or argued in the court below or the appellate court, it will not be considered on appeal.

Argued October 12, 1920. Appeal, No. 78, Oct. T., 1920, by plaintiff, from decree of C. P. Allegheny Co., Oct. T., 1918, No. 278, dismissing bill in equity in case of Martha McConville v. Martha J. Ingham and the Mellon National Bank of Pittsburgh. Before Brown, C. J., Frazer, Walling, Simpson and Kephart, JJ. Reversed.

Bill in equity for injunction and an accounting. Before Carnahan, J.

The opinion of the Supreme Court states the facts.

The court dismissed the bill. Plaintiff appealed.

*Error assigned* was decree, quoting it.

*Thomas L. Morris,* with him *L. K. & S. G. Porter,* for appellant.—Under the law of Pennsylvania, the burden of proving a gift rests on the donee where there is any appearance in the case of weakness of mind, undue influence, fraud, deception, confidential relation or other element to render the transaction at least suspicious or where the alleged donee has had opportunities to obtain possession of the subject of the gift without title: Greenfield's Est., 14 Pa. 489; Worrall's App., 110 Pa. 349; Stewart's Est., 137 Pa. 175; Maxler v. Hawk, 233 Pa. 316; Smith's Est., 237 Pa. 115; Reading Trust Co. v. Thompson, 254 Pa. 333; Hasel v. Beilstein, 179 Pa. 560.

*Geo. D. Wick,* with him *W. W. McAdams, Geo. L. Roberts* and *Reed, Smith, Shaw & Beal,* for appellee.— In Pennsylvania the rule is firmly established that the evidence to establish a parol express trust must be clear, explicit and unequivocal: Dollar Savings F. & T. Co. v. Trust Co., 223 Pa. 286; Hollis v. Hollis, 254 Pa. 90, 97; Washington's Est., 220 Pa. 204-5; Hasel v. Beilstein, 179 Pa. 560; Robinson v. Powell, 210 Pa. 232; Fague's Est., 19 Pa. Superior Ct. 638; Earnest's App., 106 Pa. 310; Dumbach v. Bishop, 183 Pa. 602; Hayes's App., 123 Pa. 110; Fidelity Ins. T. & S. D. Co. v. Moore, 194 Pa. 617; Braun v. Church, 198 Pa. 152.

Plaintiff's testimony was far below the standard of proof always required in such cases: Worrall's App., 110 Pa. 349.

OPINION BY MR. JUSTICE SIMPSON, December 31, 1920:
The dramatis personæ in this case are: Plaintiff, a widow, aged 92, who had three sons, two daughters and a number of grandchildren, and by thrift and economy had accumulated a small estate; a granddaughter, aged 23, hereafter called the defendant, to whom plaintiff had

delivered checks for a large part of the small estate, which defendant deposited in her own name in the Mellon National Bank of Pittsburgh (also a defendant, but hereafter called the bank), instead of in plaintiff's name, as the latter says should have been done, and, because they were not, filed the bill in equity in this case.

On March 27, 1916, plaintiff was a depositor in the bank, the balance in her favor being $27,411.78. On that day she transferred the account to her two daughters, one of whom was defendant's mother. It does not appear what was the purpose and effect of this transaction, but evidently it was not an ordinary gift to them, for the deposit was so made that either could withdraw the whole of it at any time, and if one died the survivor was to become sole payee; no part of it was in fact drawn out by either; and when later plaintiff demanded a check for the whole of it, including accrued interest, the daughters at once complied with her requirement.

Defendant desiring to have a saving-fund account of her own, plaintiff made a gift to her of $5,000 with which to open it. On April 21, 1917, defendant and her mother went to the bank and the former deposited the $5,000 in her own name in the savings department. At the same time the mother, in order to comply with plaintiff's demand for the amount in the joint account, requested a clerk at the bank to calculate the interest thereon, and to draw a check in plaintiff's favor for the aggregate sum thus ascertained. This was done, the total amount being $28,456.79; the mother then signed the check and she and defendant took it to plaintiff's home and delivered it to her. The other daughter was then sent for, and signed it in the presence of defendant and her mother; defendant denies she was present, but the fact was found by the chancellor to be as stated. Shortly after, when plaintiff and defendant were alone in the former's bed-room, where she "spends most of her time," she endorsed the check to the order of defendant and handed it to her. The latter testified that until then she did not

know of any intention to give the money to her, and that plaintiff, who was over ninety years of age, broke down, "was very weak at the time and she cried." Defendant does not admit plaintiff's mind was then affected, but says that in the September following she "was so weak mentally that she could be made to do things that she otherwise would not do," "and she had been in that state for some time"; the change in her condition from that in the April preceding, when the alleged gift was made, evidently being one of degree only, due to her advancing age. Excluding the amount of the alleged gift, plaintiff's estate consisted of realty worth "not over $35,000" and money aggregating "somewhere between $3,000 and $4,000."

At this same interview plaintiff also delivered to defendant a black box containing old coins and jewelry. Plaintiff says the check was to be deposited in her name in the bank, and the box to be left there for safe keeping. Defendant says both were absolute gifts, but nobody corroborates her, and, as already stated, no one else was present at the time. She says she told no one of the alleged gifts except her mother, who was dead at the time of the trial, and her counsel, who took part in the trial but did not testify. She took the check, and deposited it in her own name in the bank, in the same saving fund account which she had opened with the $5,000. She also took the black box and left it with the Farmer's National Bank, but gave to plaintiff the following paper: "In Melon's bank in safe deposit vault are some valuable things. Martha Ingham." Defendant says she did not write or sign this paper, yet every word of it is in her handwriting. Though defendant repeatedly saw plaintiff between the date of the alleged gifts and June, 1918, she does not say she ever spoke of them to plaintiff or told the latter how they had been deposited, save as by the above paper she misled plaintiff regarding the black box.

On June 20, 1917, the bank allowed additional interest on the joint account in the name of the two daughters, and they thereupon drew a check in favor of plaintiff for the amount thereof, viz: $414.89, and she endorsed it exactly as she had the one for $28,456.79, and it was deposited by defendant in the same account. She says this was also a gift to her, but plaintiff says it was to be deposited to her account. The only draft made by defendant on the saving-fund account was for the accumulated interest thereon, amounting to $694.56. She gave to the bank, however, two notes for $3,500 each, the proceeds of which she invested in mortgages in her own name. She says this course was pursued because she did not want to break in on the interest allowed on the account —a somewhat curious explanation, since the bank was paying but four per cent on the deposit and was charging six per cent on the loans. When the notes fell due they were charged against this account. Plaintiff had no knowledge of any of these facts.

On October 3, 1917, plaintiff gave to defendant a check for $3,000. Plaintiff says this was a loan; defendant says it was a gift to help pay the expenses of her mother's last illness (who had a reasonable estate of her own), but when plaintiff demanded its repayment twelve days later, defendant paid $900 on account, and now admits she owes the balance of $2,100. It will be noted all of this transaction occurred after the time defendant says plaintiff "was so weak mentally that she could be made to do things that she otherwise would not do."

Plaintiff also gave defendant certain other sums of money. On May 22, 1917, she received $100, for what purpose she says she cannot now remember; on June 2, 1917, $37.85 to pay for plants she bought for plaintiff; and in 1918, the exact dates not being stated, she received $40 to buy a dress to wear at her cousin's wedding, and $300 to pay her brother's expenses at Cornell University. All these moneys were received while she owned, as she says, the large sums hereinbefore speci-

fied.  Three or four days before June 25, 1918, defendant
was crying and upon being asked the cause said "she was
absolutely broke," "she had nothing to live on, and that's
why she was crying."

When her mother died, defendant was one of the execu-
tors and made return to the Commonwealth of the
amount of this estate for the purpose of state taxation;
but so far as concerns the large sums, the subject of this
litigation, she made no personal return, although they
were drawing interest, and if they were hers she should
have done so and paid the taxes thereon.

On June 25, 1918, plaintiff's son, at her request, tele-
phoned defendant that plaintiff "requested her to bring
down a black box which was given her for deposit in
Mellon's vaults, and also the money and other property
she had given her to take care of."  He says "she said
she would bring them down the next day."  Defendant
denies she promised to return them, but admits she prom-
ised to call.  She did not even do this, however, but in-
stead thereof wrote to plaintiff on June 27, 1918:
"Whats caused this change, you have ignored me, and
changed your mind so.  What have I done to you.  Will
not be in town until I hear more."  On the same day
plaintiff replied acknowledging receipt of the note, re-
ferred to defendant's promise to return the money, and
added: "I write you now to bring down the box and also
to bring down all the money which I gave in your care
to deposit for me,......as I want my property in my
own possession."  On July 1, 1918, defendant went to
plaintiff's house, and returned the black box and its con-
tents, except a pin and a pair of earrings, which she was
allowed to keep.  She did not return the money, how-
ever, but in response to plaintiff's demand for it, said:
"I have to give forty days notice to the bank, which I
did......you can't get it for forty days, because it re-
quires that time to notify the bank to get it."  This did
not satisfy plaintiff, who on the same day wrote "You
left......this morning without paying over to me the

money I confided to your care until I required it. I have written you and telephoned you about this and I demand and insist that you return here at once and pay over to me the money or give and transfer to me the cheques covering the monies I gave you to deposit." Defendant's only reply was to request plaintiff to pay her a visit. Plaintiff's son meanwhile went to the bank and induced it to waive the thirty (not forty) days' notice required for withdrawals from the account, and so telephoned defendant, requesting her to keep her promise to return the money to plaintiff. As this was not done, the latter on July 8, 1919, wrote defendant referring to the waiver by the bank and adding "so I desire you to go down to that Bank tomorrow, July 9th, and transfer to my deposit a/c and put in my own name all of the money which I confided to your care to deposit for me." Defendant's only response was: "I wonder about you since you haven't answered my last letter—Have you a woman yet or are you trying to go on alone—Please write me as I care about you and shall never change my affection for you." Plaintiff's reply thereto, dated July 11, 1918, was: "Martha What do you mean by your Falure to Return to me the money I entrusted with you to I Required it from you. Surely you Should complied with my Requestt to deposidet to my own account and in my own name in Mellons National Bank. I now write you again to make the Deposit at once So I may have the money in my own Possession or else Bring down to me here Certified Checks for the ammount and deliver the Same to me in Person, that is the honest and Propper way to Show your Regard for me and my health." This is the only letter the body of which is in plaintiff's handwriting, and to it no reply was made. Plaintiff's two sons and one granddaughter thereupon wrote defendant a letter as follows: "Your grandmother is in an extremely nervous condition, really ill with worry and anxiety because you have failed to return her the money which she has confided to your care. She cannot under-

stand why you subject her to this strain and we unite in urging you to at once return her money to her." This closed the correspondence, defendant making no reply thereto.

It will be observed that at no time did defendant say the money was a gift to her, or deny her alleged promises to return it, either as made at the time she received it or in the conversations above referred to. She did not, however, keep her promises, and hence plaintiff filed the present bill in equity, praying a decree that the money was hers, that defendant be required to render an account and to transfer to plaintiff the moneys in the bank, and that the bank be enjoined from paying these funds to anybody but plaintiff. In defendant's answer she averred, for the first time, that the money was a gift to her; set forth the foregoing additional sums received by her except those for $100 and $37.85, which she seems to have overlooked; denies "that the plaintiff herself made any demands upon me to return any money to her which I had in my possession" (though the letters above quoted negative this statement); and avers "I am the owner in my own right of an interest in the estate of my grandfather (subject to the rights of my grandmother), which consists largely of real estate in the Town of Steubenville, and also own other real estate which came to me from my father and mother, and am absolutely responsible." In its answer the bank admitted the facts, so far as they were within its knowledge, and submitted itself to the court.

In her evidence defendant says plaintiff did not write and ask her, defendant, to return the black box and its contents, though the letters above quoted flatly contradict her; and that the reason why she told only her mother and counsel of the alleged gifts, was because plaintiff did not wish anybody to know of them; but she does not explain (1) why she did not so state during the correspondence and conversations immediately preceding the filing of the bill; or (2) why, if she has so much

money and property, she received the various other small
sums paid to her as if she were poor; or (3) why she
said she was "absolutely broke" and "had nothing to
live on," though all the time she had this large sum in
bank to her credit; or (4) why, seeing plaintiff's weak-
ness, and the crying which evidenced her mental distress,
at the time she says the alleged gifts were made, she did
not at least wait until plaintiff was in a better mental
and physical condition before accepting them; or (5)
why, if this did not then occur to her, she did not frankly
go over the matter with plaintiff when, by plaintiff's in-
sistent demands, it was made clear she claimed she did
not intend to give the money to defendant; or (6) why
upon demand she returned the black box and its con-
tents, which were alleged to have been given at the
same time and under the same circumstances, without
even averring they were gifts.

In his adjudication the trial judge found the facts
substantially as above set forth, except those relating
to plaintiff's mental and physical condition. As to these
he wholly overlooked defendant's testimony above quot-
ed, and in opposition thereto found that plaintiff "Is a
large and healthy woman, physically. She has never
shown any mental weakness......She is still [July 8,
1919] a strong woman mentally, except that her memory
is now failing. How long it has been failing does not
appear." The reasons he gives for so concluding, are
thus stated by him: "She......is still managing her
own estate and attending to the interests of her children
in the estate left by her husband. She makes annual
statements to them of moneys collected and due to them
and she regularly distributes their respective shares.
She has always so done. Because of such physical in-
firmities as naturally attend a person of her age, she
does not personally make collections, do the clerical
work or attend to repairs, but she controls, directs, and
supervises everything in connection with the manage-
ment." The evidence does not justify these statements

as of the date of the alleged gift. True, her husband left property over which, by agreement of the children, she was given control immediately after his death in 1878, and this they have not yet formally taken from her, probably because it would add to her distress so to do; but some one else reported what repairs were needed, some one else saw that they were satisfactorily done, some one else rented the properties and collected the rents, and some one else kept the accounts and prepared the statements thereof which were sent to the parties interested. Defendant's testimony as to plaintiff's condition at the time the alleged gift was made and thereafter, is not really disputed, and, when considered together with the foregoing undisputed facts, makes certain that plaintiff's connection with the estate was but the survival of a system adopted when she was strong and able to be around, and that the control, direction and supervision to which the trial judge refers, had become practically nominal (though it had not been wholly taken from her) and required her to seek the advice and assistance of her sons in important matters, as unquestionably she did. It is thus made clear the trial judge's conclusion that the plaintiff is a strong woman physically and mentally is a manifest error. Defendant had every reason to so prove if it was the fact; and hence her testimony to the contrary makes the error doubly plain. Because of this mistake, although he finds the other facts above specified, he reported in favor of a dismissal of the bill. Plaintiff filed exceptions which were overruled and a decree of dismissal entered, whereupon she took this appeal.

The primary error of the court below is in the foregoing findings regarding plaintiff's condition, and the secondary error is in its conclusion: "The burden [of proof] is on the plaintiff to produce......evidence and she has not produced it," which shall "be 'clear, explicit and convincing, not only as to the existence of the trust, but as to its terms and conditions.'" No one questions

but that the rule is correctly stated in its application to those cases wherein some one other than the donee named endeavors to prove by parol that he was the person intended to be benefited. In the present instance, however, the question as to whether or not there was a gift, was the initial inquiry and the storm centre of the controversy. Upon this point the burden of proof was on defendant and not upon plaintiff (nemo præsumitur donare), not only because the original ownership of plaintiff is presumed to continue (Oller v. Bonebrake, 65 Pa. 338; Hartman v. Pittsburgh Incline Plane Co., 11 Pa. Superior Ct. 438; 16 Cyc. 1052; 10 Ruling Case Law 872; 14 Am. & Eng. Ency. of Law, 2d ed., 1051), but also because the defense is an affirmative one, which necessarily carries with it the burden of proof (Hasel v. Beilstein, 179 Pa. 560; Maxler v. Hawk, 233 Pa. 316; 12 Ruling Case Law 971); and the requirements in the bearing of this burden, in cases like the present, are pointed out in Beach on Equity, quoted in Stepp v. Frampton, 179 Pa. 284, 289: "But when the relation existing between the contracting parties appear to be of such a character as to render it certain that they do not deal on equal terms, but that on the one side,......from overmastering influence, or on the other side, from weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, then the burden is shifted, and the transaction is presumed void, and it is incumbent on the party in whom such confidence is reposed......to show affirmatively that no deception was used, and that all was fair, open, voluntary and well understood. This principle is of very general application......and the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise." The rule is stated to the same effect in 14 Am. & Eng. Ency. of Law (2d ed.) 1036; 39 Cyc. 1219. These conclusions render inapplicable the decision in Robinson v. Powell, 210 Pa. 232, which appellee says is the ruling case;

for there a third party "undertook to impress upon a gift [admittedly] made to appellant a parol trust," while here the fact of a gift is denied.

Applying the principles above set forth, compels a reversal of this decree, since there is no proof of the alleged gift except defendant's unsupported declaration, which is discredited by the contradictions appearing in her testimony, and by her conduct which is wholly inconsistent with her claim. Moreover, she produced no affirmative evidence "that all was fair, open, voluntary and well understood," as she was required to do in view of the conceded old age, weakness and distress of plaintiff. It is true that, as the endorsement of the checks are absolute in form, a presumption of an intention to give may arise therefrom, but this rises no higher than defendant's testimony, and has no bearing upon the requirements of proof in view of plaintiff's weakness. In every aspect of the matter, therefore, we are forced to the conclusion that defendant has not proved her right to retain this large proportion of plaintiff's comparatively small estate.

We are not unmindful of the fact that the court below has found, as a conclusion of law, that "The checks for $28,456.79 and $414.89, were endorsed and delivered to Martha Jane Ingham [defendant] as voluntary gifts, so intended by Martha McConville [plaintiff] and so received by Martha Jane Ingham"; but, as shown above, this legal result is reached by an inference founded on an erroneous conclusion regarding vital facts, and by misapplying legal principles; and this brings the case squarely within the rule stated in Worrall's App., 110 Pa. 349, 362, later quoted in Bergner v. Bergner, 219 Pa. 113, 116: "The defendant refers to the rule that, except for plain mistake, this court will not set aside the master's finding of fact, especially when that finding had been confirmed by the court below. In a suit in equity the finding of a master is not conclusive, as is the verdict of a jury in a trial at law. Upon exceptions to the

master's findings of fact the court of original jurisdiction is bound to examine the evidence and determine what are the facts. Whether that court agrees or disagrees with the master's findings, on appeal the appellate court shall in like manner determine if the facts have been rightly found. When the appellate court is satisfied that facts have been found without proof, or material facts established by the proofs have not been found, it follows that there has been plain mistake. In the several stages of the proceeding there is no place for a perfunctory consideration of the evidence relative to facts in dispute."

Defendant's answer also avers there is an adequate remedy at law for the recovery of the money, but we need not consider this since she did not have it decided "in limine before a hearing of the cause upon the merits," as provided by the Act of June 7, 1907, P. L. 440, did not raise it by a point at the trial, and did not argue it in the court below or here.

The decree of the court below is reversed, and the record is remitted with directions to enter a decree for an injunction and accounting so far as relates to the items of $28,456.79, $414.89 and $3,000, and for further proceedings in regard thereto according to equity practice; the costs in the court below and in this court to be paid by appellee.